**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **US Herbs, Inc., et al.,** | ) | **CASE NO. 1:15 CV 2557** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **Riverside Partners, LLC, et al.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant Rocket Farms Herbs, Inc.'s Motion for Summary Judgment (Doc. 45) and Plaintiffs' Motion for Summary Judgment (Doc. 49). This is a breach of contract dispute. For the reasons that follow, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant Rocket Farms Herbs, Inc.'s Motion for Summary Judgment is GRANTED.

**FACTS**

Plaintiffs, US Herbs, LLC, Matt Karni, Karni Family Farm, LLC, and US Herbs Co.,

1

LLC (collectively, "US Herbs") brought this action against defendants, Riverside Partners, LLC, 2003 Riverside Capital Appreciation Fund, L.P., (collectively, "Riverside Defendants") and Rocket Farms Herbs, Inc. ("Rocket Farms") alleging wrongdoing in connection with a supply agreement.  The Court previously dismissed the Riverside Defendants.

1.  Agreements between US Herbs and Herb Thyme, Inc. ("Herb Thyme")

In August of 2010, US Herbs entered into a supply and licensing agreement ("Supply Agreement") pursuant to which Herb Thyme agreed to act as US Herbs's exclusive supplier of fresh packaged herbs.  The Supply Agreement provides, in relevant part:

9)  TERMS OF SALE OBJECTIVES

   It is understood and agreed to by both parties that the intent of this Agreement is to accomplish the following:

(a)  Protect [US Herb's] brand with its current customers.

(b)  Consolidate [US Herb's] supply chain to use [Herb Thyme's] operations.

(c)  Provide a one year window of opportunity for [US Herbs] to recover accounts that it has previously lost.

(d)  Provide opportunity for [US Herbs] to sell [Herb Thyme] products in markets that are not currently served and supported by [Herb Thyme's] current sales staff

(e)  Provide the platform in which [US Herbs] can grow its ongoing sales and increase its current market penetration

(f)  Provide the platform for a smooth transition to [Herb Thyme] at a time that [US Herbs] decides to sell the business

The Supply Agreement also contains a noncompete provision that outlines the parties' rights and obligations to sell to certain customers in the event the Supply Agreement is terminated in a specific way.  US Herbs alleges that the Supply Agreement was in fact terminated.

Subsequently, in July of 2011, US Herbs and Herb Thyme entered into a new agreement. ("Second Contract").  In part, the impetus for the Second Agreement appears to be a $180,000 outstanding debt that US Herbs owed Herb Thyme from other transactions.  Pursuant to the Second Agreement, Herb Thyme was to pay US Herbs a monthly payment.  The monthly payment was applied in part to the outstanding debt.  In the first "whereas" clause in the Second Agreement, the parties define the term "Customers" to be  "customers, including the customers identified on 'Exhibit B' that became customers of [Herb Thyme] through [US Herbs]."  In addition to the whereas clause, the parties agreed to Section 3.1, which provides:

> 3.1 [US Herbs] agrees that it shall not and shall not permit any of its agents (including but not limited to Mati Kami) to contact any [Herb Thyme] customer (including but not limited to any Customer listed on Exhibit B) on behalf of [US Herbs] with respect to herbs during the term of this Agreement, except in response to a telephone message or other communication initiated by the customer. [Herb Thyme] has provided a list of [Herb Thyme] customers as of June 29, 2011, in Exhibit E, which may be amended from time to time.

The Second Agreement also contains a termination provision.  That provision provides as follows:

> 4. Term and Termination.
>
> 4.1 Unless sooner terminated according to its terms, this Agreement shall commence on the Effective Date and expire on June 30, 2015, except for [Herb Thyme's] obligation to make a final payment of Earned Margin to [US Herbs] on or before July 15, 2015.
>
> 4.2 This Agreement shall automatically terminate immediately if [US Herbs] violates the restrictions of paragraph 3.l or 3.2. In the event of such a termination, within 15 days after the termination date, [Herb Thyme] shall make a final payment to [US Herbs] of any Earned Margin owed based on amounts received from Customers before the termination date.
>
> 4.3 This Agreement shall automatically terminate immediately if [Herb Thyme] fails to make any payment hereunder within 30 days from the date that the payment is due.

3

> 4.4  Either Party, at its option, without prejudice to any and all rights and remedies it may have under this Agreement or under applicable law, may terminate this Agreement, effective immediately, by providing the other party with written notice of termination, if such other party becomes insolvent or is the subject of any liquidation, receivership, bankruptcy, reorganization or other creditor's proceedings, either voluntary or involuntary.

It appears that Herb Thyme made monthly payments up through and including November of 2012.  It is undisputed that Herb Thyme did not make the December 2012 payment.

2.  Rocket Farms's acquisition of Herb Thyme

In December of 2012, Rocket Farms, Herb Thyme, and a number of other entities (including Herb Thyme's secured creditors) entered into an asset purchase agreement ("AP Agreement").  Pursuant to the AP Agreement, Rocket Farms purchased certain assets from the secured creditors and Herb Thyme, in lieu of a private foreclosure sale.  Rocket Farms paid nearly $6 million for these assets. According to Rocket Farms, it did not purchase the assets directly from the shareholders of Herb Thyme.  Herb Thyme retained certain assets after the purchase.  In addition, Rocket Farms assumed certain liabilities of Herb Thyme.  The AP Agreement indicates, however, that Rocket Farms did not assume any liability "arising out of or related to the Contracts other than the Safeway Contract or the Real Properly Lease for any Company Facility."  AP Agreement § 2.3(b).

After the acquisition, Rocket Farms began selling herbs to customers, including former customers of US Herbs and Herb Thyme.  Rocket Farms made no payments to US Herbs.

Thereafter, US Herbs filed the instant lawsuit asserting seven claims for relief.  Counts six and seven were previously dismissed.  Accordingly, counts one through five remain pending against Rocket Farms.  Counts one and two assert claims for tortious interference with contract.  Count three is a claim for tortious interference with business relationship.  Count four is a claim

for breach of contract and count five asserts unjust enrichment.

The parties cross-move for summary judgment and each opposes the other's motion.

**STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed .R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  See, Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

5

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

## **ANALYSIS**

The Court will address all claims, but not in the order asserted in the complaint.

1. Breach of contract (count four)

US Herbs argues that Rocket Farms breached the Second Agreement by failing to make monthly margin payments thereunder.  According to US Herbs, Rocket Farms is liable as a successor in interest to Herb Thyme.  In response, Rocket Farms argues that the Second Agreement was properly terminated and, therefore, Rocket Farms could not be in breach of the agreement.  Alternatively, Rocket Farms claims that because the AP Agreement is an asset purchase, it is not liable as a successor in interest to Herb Thyme.

Upon review, the Court finds that Rocket Farms is entitled to summary judgment on US Herbs's breach of contract claim.  Pursuant to the plain language in the Second Agreement, termination occurred automatically if either US Herbs contacted any Herb Thyme customer (including those identified in Exhibit B), or Herb Thyme failed to remit a monthly payment.  Here, it is undisputed–and in fact alleged–that Herb Thyme failed to remit the December 2012 payment.  Thus, the Second Agreement terminated automatically within thirty days of the date the payment was due.  Thus, by the end of January 2013, the Second Agreement was no longer in effect.

Plaintiff argues in essence that by upholding the termination provision, US Herbs is unfairly treated because it is not compensated for the work it performed in cultivating the customer relationships.  Rather, Rocket Farms obtained the benefit of continuing to service US Herbs's customers without remitting the monthly payment to US Herbs.  This argument is flawed in at least two respects.  First, US Herbs points to nothing in the Second Agreement supporting its position that the customers at issue "belong" to US Herbs.  On the contrary, the clear language of the Second Agreement demonstrates that the parties to the Second Agreement

understood that the customers were in fact customers of Herb Thyme. *See*, First Whereas Clause[1]; Section 3.1.[2] Second, US Herbs mistakenly construes the Second Agreement to be a "supply agreement" pursuant to which Herb Thyme somehow agreed to supply customers of US Herbs with freshly packaged herbs. Once again, however, US Herbs cites to no provision in the Second Agreement supporting its position. Rather, unlike the Supply Agreement, it appears that the Second Agreement is a variation on a noncompete agreement. Pursuant to its terms, US Herbs agreed not to contact customers in exchange for a monthly payment. US Herbs cites to no other consideration it provided supporting the Second Agreement. The noncompete provision, however, does not survive termination. Thus, 30 days after the failure of Herb Thyme to remit the December 2012 payment, US Herbs was free to contact any customer–including those appearing on Exhibit B to the Second Agreement. US Herbs points to nothing supporting its position that the Second Agreement somehow survived Herb Thyme's failure to remit the December 2012 payment. Rather, by its terms, the Second Agreement terminated automatically thirty days after the payment was due.

US Herbs does, however, argue that the Court should not construe the Second Agreement

---

[1] Plaintiff argues that courts have routinely held that "whereas" clauses contained in contracts are not enforceable terms. While this may be true, in this case, the parties defined the term "Customers" in the whereas clause. That term is then used by the parties in other provisions of the Second Agreement. Moreover, as noted, the First Whereas Clause is not the only place in the Second Agreement clarifying that the customers belong to Herb Thyme.

[2] The affidavit of Matt Karni does not create an issue of fact. There, he avers that Exhibit B contains a list of *US Herbs's* customers. This legal conclusion, however, is belied by the clear and unambiguous contractual language.

in such a way so as to render it illusory.  It appears that US Herbs may be arguing that since either party could terminate the Second Agreement at will, it is illusory.  The Court disagrees.  Here, the Second Agreement required performance on the part of US Herbs.  Thus, for example if US Herbs performed by refraining from contacting Herb Thyme's customers, then Herb Thyme owes US Herbs the monthly fee.  Thus, the existence of the termination provision does not render the Second Agreement illusory.

To the extent the Second Agreement *could* be considered illusory, the Second Agreement is simply unenforceable.  Plaintiff asks the Court to construe the Second Agreement to contain a term requiring Herb Thyme to use its "best efforts" to supply herbs to US Herbs's customers.  As an initial matter, as set forth above, plaintiff points to no provision in the Second Agreement indicating that the customers belonged to US Herbs.  Moreover, in asking the Court to impose a "best efforts" clause, plaintiff is in reality asking the Court to read out of the Second Agreement the termination provision.  US Herbs does not claim that Herb Thyme failed to use its best efforts.  Rather, US Herbs's true complaint is that Herb Thyme failed to remit the monthly payment, which triggered the termination provision.  The parties expressly agreed to that provision and there is no claim that any part of the Second Agreement is ambiguous.  The Court will not rewrite the Second Agreement in such a manner that wholly ignores the termination provision and in essence "creates" a supply agreement.  Thus, to the extent the termination provision renders the Second Agreement illusory, it is unenforceable.

Based on the foregoing, the Court finds that the Second Agreement terminated by its terms no later than January of 2013.  Accordingly, no breach of contract action lies after this date regardless of whether successor liability exists on behalf of Rocket Farms.

The Court will, however, address successor liability.  There appears to be no dispute that US Herbs performed under the Second Agreement by refraining from contacting Herb Thyme's customers up to and including December of 2012, and that the failure to remit payment due in exchange for US Herbs's performance constitutes a breach of the Second Agreement.  A question remains, however, as to whether Rocket Farms can be held liable for this breach.[3]

Under Ohio law, a successor corporation may be liable if one of the following occurs:

(1) the buyer expressly or impliedly assumes such liability;

(2) the transaction amounts to a de facto merger;

(3) the buyer corporation is merely a continuation of the seller corporation; or

(4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 346 (1993).

US Herbs argues that Rocket Farms may be held liable because Rocket Farms impliedly assumed the Second Agreement.  According to US Herbs, the Second Agreement provides that it is binding on all entities that purchase substantially all of the assets of Herb Thyme.  According to Herb Thyme, Rocket Farms possessed the Second Agreement during its due diligence period.  In addition, according to US Herbs, Herb Thyme "listed US Herbs as an account receivable" in documents provided to Rocket Farms.  Rocket Farms continued to use labels identified in the Second Agreement, but substituted its own name.  In addition, Rocket Farms continued to service "US Herbs's" customers and collected substantial funds.  In response, Rocket Farms

---

[3] This is so because Rocket Farms purchased the assets at issue on December 9, 2012, and the payment was not due until December 15, 2012.  Thus, the Court must determine whether Rocket Farms is a successor in interest for purposes of the December 2012 payment.

10

points out that the AP Agreement expressly identifies the liabilities assumed by Rocket Farms. The Second Agreement is not listed therein. Moreover, the AP Agreement provides that Rocket Farms is not assuming liabilities "arising out of or related to any Contracts other than the Safeway Contract or the Real Property Lease for Any Company Facility..." Rocket Farms further notes that neither Herb Thyme nor US Herbs, as the only two parties to the Second Agreement, could impose in that agreement an obligation on a third party purchaser of the assets of Herb Thyme.

      Upon review, the Court agrees with Rocket Farms. The AP Agreement expressly provides that Rocket Farms is not assuming any liability for contracts, with the exception of the Safeway Contract and the Lease. Thus, not only did Rocket Farms not expressly assume the Second Agreement, it *expressly disclaimed* liability thereunder. Moreover, the fact that Rocket Farms knew of the Second Agreement through due diligence, yet opted to expressly forego assumption of the agreement, bolsters the Court's conclusion that Rocket Farms did not impliedly assume the liability. And, on the facts of this case, the Court is not convinced that two parties to an agreement can bind a potential asset purchaser. Thus, the language purporting to bind any future asset purchaser does not mandate a finding of express or implied assumption.

      The remaining argument raised by US Herbs once again relies on a fundamental misunderstanding of the Second Agreement. US Herbs claims that Rocket Farms impliedly assumed the Second Agreement because it continued to service "US Herb's" customers. Not so. As set forth above, there is no evidence that these customers somehow "belonged" to US Herbs. Rather, the clear language in the Second Agreement provides that US Herbs agreed to forego

contact with Herb Thyme's customers in exchange for a monthly fee.[4] The Second Agreement is *not a supply agreement*. Thus, Rocket Farms was free to sell herbs to any customers with no duty to US Herbs. There is no evidence or suggestion that Rocket Farms impliedly assumed any obligation to pay the monthly fee or made any attempt to prevent US Herbs from contacting any customer of its choosing. Therefore, Rocket Farms is entitled to summary judgment on the issue of express or implied assumption.

The Court also rejects US Herbs's argument that the AP Agreement resulted in a de facto merger. "A de facto merger is a transaction that results in the dissolution of the predecessor corporation and is in the nature of a total absorption of the previous business into the successor." *Welco*, 67 Ohio St.3d 349.

> The hallmarks of a de facto merger include (1) the continuation of the previous business activity and corporate personnel, (2) a continuity of shareholders resulting from a sale of assets in exchange for stock, (3) the immediate or rapid dissolution of the predecessor corporation, and (4) the assumption by the purchasing corporation of all liabilities and obligations necessary to continue the predecessor's business operations. One court has indicated that *a transfer of assets for stock is the sine qua non of a de facto merger*.

*Id*. (Emphasis added).

Here, the Court finds that Rocket Farms is entitled to summary judgment. As an initial matter, it is undisputed that Rocket Farms purchased the assets in a secured party asset sale. There is no evidence indicating that the assets were transferred for stock, as is the "sine qua non" of a de facto merger. Nor is there any evidence that Herb Thyme "immediately or rapidly" dissolved. Although plaintiff points to emails discussing a possible bankruptcy filing on behalf of Herb Thyme, there is no evidence that a bankruptcy filing actually occurred or that it resulted

---

[4] It would be a strange setup indeed if US Herbs agreed to refrain from contacting its own customers.

12

in the dissolution of the entity.  Although plaintiff notes that Rocket Farms continued in the previous business and maintained corporate personnel,[5] this is insufficient to warrant a finding that the transaction resulted in a de facto merger.  *See, id.* (De facto merger did not occur where transaction involved assets purchased for cash as opposed to stock and the previous entity remained in existence as a shell, even though new entity continued same line of business as previous entity).  The evidence presented by Herb Thyme is not sufficient to create a genuine issue of material fact and the Court will not impose successor liability on Rocket Farms.

Nor does the "mere continuation" theory require an imposition of successor liability.  The Ohio Supreme Court held that:

> [T]he "basis for this theory is the continuation of the corporate entity, not the business operation, after the transaction.  Such would be the case when one corporation sells its assets to another corporation with the same people owning both corporations.  Thus, the acquiring corporation is just a new hat for, or reincarnation of, the acquired corporation.  This is actually a reorganization.

*Welco*, 67 Ohio St. 3d at 350 (citations and quotations omitted).

Here, US Herbs points to a number of facts that it claims satisfy this theory of liability. By way of example, US Herbs notes that Rocket Farms continued in the same line of business

---

[5]  Rocket Farms objects to nearly all of the documentary evidence offered by US Herbs.  According to Rocket Farms, US Herbs engaged in no deposition discovery in this matter and cannot authenticate any of the documents it presents.  Because the Court finds that Rocket Farms is entitled to summary judgment even considering the evidence presented by US Herbs, the Court need not address Rocket Farm's admissibility objections.   The Court notes, however, that it is doubtful that some of US Herb's evidence is properly before the Court.  By way of example, in support of its claim that Rocket Farms retained Herb Thyme's personnel, US Herbs relies on a press release.  That press release constitutes inadmissible hearsay.

13

and maintained the same employees and officers as Herb Thyme.  These facts, however, do not relate to the standard "mere continuation" theory.  Rather, those factors relate to the "expanded mere-continuation theory."  *See, Welco,* 67 Ohio St. 3d at 348 (noting that sharing "same physical plant, officers, employees, and product line" are relevant only to the expanded mere-continuation theory of successor liability).  The Ohio Supreme Court, however, expressly rejected application of the expanded mere-continuation theory to contracts cases.  *See, Id.*  Here, because there is no evidence suggesting that there is any overlap in ownership between Herb Thyme and Rocket Farms or that Rocket Farms is a continuation of the corporate existence of Herb Thyme, successor liability cannot be based on the mere-continuation theory.

The Court further rejects any argument that the AP Agreement was entered into fraudulently for the purpose of escaping liability.  To the contrary, it is undisputed that the AP Agreement arose as a result of Herb Thyme's default with respect to its secured party lenders, who are parties to the AP Agreement.  There is simply no evidence that places the "propriety of the sale into doubt or otherwise suggest[s] that the sale occurred to evade liabilities" as required under *Welco*.  The Court rejects any argument by US Herbs that the AP Agreement is not supported by adequate consideration.   Rocket Farms paid nearly $6 million for the assets and US Herbs wholly fails to establish through any evidence that this amount is inadequate.

Based on the foregoing, the Court finds that US Herbs fails to present evidence sufficient to create a genuine issue of material fact on the issue of successor liability.  As such, Rocket Farms cannot be held liable for failing to make the December 2013 payment.[6]

---

[6] Because the Court finds that Rocket Farms is not a successor in interest, it bears no liability for the Second Agreement even if the agreement was not terminated.

2.  Unjust enrichment (count five)

Where "a party retains money or a benefit that in equity or justice belongs to another," he will be liable for unjust enrichment. *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 222 (6th Cir. 1992) (citing *Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938)). The elements of a claim for unjust enrichment include (1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (citing *Hummel*). Under this theory of recovery, "civil liability may be imposed where one party retains a benefit from another's labors." *Guardian Technology, Inc. v. Chelm Properties, Inc*., 2002 WL 31087415 at *2 (Ohio App. 8$_{th}$ Dist. Sept. 19, 2002) (citing *Shaw v. J. Pollock & Co.*, 612 N.E.2d 1295 (Ohio App. 9$_{th}$ Dist. 1992)).

Here, US Herbs alleges that its unjust enrichment claim is based on Rocket Farms's failure to remit payments from sales it made to "US Herbs's customers."  The Court finds that Rocket Farms is entitled to summary judgment on this claim.  As an initial matter, the payments made by the customers were not conferred by US Herbs on Rocket Farms.  Thus, an unjust enrichment claim does not exist as it pertains to those amounts.  In the course of the parties' briefing, US Herbs also appears to argue that it conferred the benefit of its "substantial customer development" on Rocket Farms.  There is no evidence, however, supporting a conclusion that US Herbs conferred this benefit on Rocket Farms.  As set forth throughout this Opinion, the Second Agreement makes clear that the customers at issue are no longer customers of US Herbs.

In fact, US Herbs can enforce the Second Agreement only if it *refrains* from contacting these customers.  There is simply no evidence that US Herbs conferred the benefit of "substantial customer development" directly on Rocket Farms.  This is so because Rocket Farms sold herbs to these customers long after the termination of the Supply Agreement.

       3. Tortious interference (counts one through three)

In count one, US Herbs alleges that Rocket Farms tortiously interfered with the Second Agreement.  According to US Herbs, by purchasing substantially all of the assets of Herb Thyme, Rocket Farms left Herb Thyme unable to comply with is obligations under the Second Agreement.  In response, Rocket Farms argues that the AP Agreement makes clear that Herb Thyme was in default of its loan documents and its lenders were preparing a private foreclosure sale.  It is with this backdrop that Rocket Farms purchased certain assets of Herb Thyme.  Rocket Farms points out that the Second Agreement did not prohibit Herb Farms exiting the herb business or ceasing payments to US Herbs.  Therefore, because the Second Agreement could be terminated at any time by Herb Thyme's decision to stop making monthly payments, Rocket Farms's purchase of assets belonging to Herb Thyme, with security interests held by its lenders, is not tortious interference with contract.

Upon review, the Court finds that Rocket Farms is entitled to summary judgment.  "In order to prove a claim of tortious interference with contractual relationships under Ohio law, one must show (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Georgia-Pacific Consumer Products LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093,1102 (6th Cir. 2012)(citations and quotations omitted).  Here, it is undisputed that

Herb Thyme was in default of its loan documents and its lenders were prepared to sell Herb Thyme's assets at a foreclosure sale.  Rocket Farms purchased some of those assets through a tri-party transaction with Herb Thyme and its lenders.  There is no evidence that the purpose or intent of the transaction was to procure a breach of the Second Agreement.  Moreover, although Herb Thyme had financial difficulties, there is no evidence that Herb Thyme could not have complied with making the December 2012 payment.  Thereafter, Herb Thyme was wholly free to terminate the Second Agreement. As such, the Court finds that plaintiff produced no evidence suggesting that Rocket Farms intentionally procured Herb Thyme's breach of the Second Agreement with regard to the December 2012 payment.  Because the contract no longer existed after Herb Thyme's proper termination 30 days thereafter, Rocket Farms could not have interfered after that date.

In count two, US Herbs asserts a second claim for tortious interference with contract. According to the complaint, Rocket Farms tortiously interfered with the contracts that US Herbs had with its customers.  Rocket Farms is entitled to summary judgment with respect to count two for the simple reason that US Herbs fails to point to any contracts between it and any customer. Accordingly, no claim for tortious interference with contract is available.

In count three, US Herbs alleges that Rocket Farms tortiously interfered with the relationships US Herbs maintained with its customers.  To state a claim for tortious interference with business relations, a plaintiff must allege: (1) a business relationship; (2) the tortfeasor's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages. *Dolan v. Glouster*, 173 Ohio App. 3d 617, 630 (Ohio Ct. App. 2007).  As set forth thoroughly herein, there is no evidence that US Herbs maintained

relationships with herb purchasers at the time Rocket Farms began selling herbs to customers. Nor is there any evidence that Rocket Farms caused any breach or termination of any such customer relationship.  Accordingly, Rocket Farms is entitled to summary judgment with respect to count three.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant Rocket Farms Herbs, Inc.'s Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/19/17